The next case for argument is United States v. Winfield. Mr. Hillis. Good morning. May it please the Court, Counsel. My name is Daniel Hillis. I represent Mr. Winfield on this appeal. He raises a single issue, the District Court's wrongful imposition of a two-level premises enhancement. The guidelines allow for a two-level enhancement if a defendant maintained a drug premises for the purpose of manufacturing or distributing a controlled substance. That unlawful conduct has to be the principal use of the premises. In making a determination about the principal use, the District Court should consider how often a defendant used a premises for distribution versus how often he used it for a lawful purpose. The premises issue here is Mr. Winfield's apartment. He lived there for almost a year, and while he was there for that year period, he did all of the normal things that a person would do in an apartment. In addition, he did some unlawful things, and that consisted of, on four occasions, he sold drugs. So how much of a sentencing boost did he get by virtue of this notion that this was a kind of stash house? The two-level enhancement, I'd have to check and see what the amount would be for his criminal history to answer the question, definitely, Your Honor, but it was significant. It resulted in many additional months of imprisonment for him, and the problem, of course, as we see it, is that the District Court didn't engage in the necessary analysis to balance the four occasions where he sold drugs in a year period versus the 365 days included with that four-day period, or the four occasions, rather, that he did all the lawful things. On balance, the principal use of the apartment was for lawful conduct, and he wasn't using it as a place to store a lot of drugs. There were not kilo qualities involved here. There was not a gun. There wasn't a lot of money that was found there. So this is where he lives? Yes. Does he have any other residence? No. This is his only residence. Does he live by himself? He does. So he's responsible. How big is his apartment? I don't know the dimensions. It's, as I understand, a one-bedroom apartment. It's a one-bedroom apartment. I think so. That is not information that was considered. It wasn't part of the District Court's analysis. But what the District Court did do was latch on to the idea that there were four drug sales, and therefore, four drug sales from an apartment leads to a premises enhancement. But that doesn't take into account the facts that do inform about the principal use of the apartment, which is by and large lawful.  The indicia of large-scale drug sales, as I started to say, doesn't exist. There aren't kilo quantities that were found there. At best, there was a thought that there may have been ounces at some point. But in paragraph 22 of the PSR, it specifically said that they couldn't consider that as proven since the substance's weight was unknown, as was its composition. They didn't know what that was. We're left here with gram quantities. I think the largest transaction of a single quantity was 5.3 grams. Under these circumstances, the evidence simply doesn't show the necessary facts to impose the premises enhancement. Well, the primary principle was opposed to in the statute incidental. Yes. So you're saying it's just incidental he was selling? Yes. Deliberate, but incidental relative to the by and large lawful conduct. That's the test. This is heroin and methamphetamine? Yes. Of a standard character or juiced up in some way or what? No, nothing that is unusual. Just the usual? Yes, the usual bad stuff, but small quantities. Ultimately, it's the government's burden to establish the premises enhancement. The government offered the four occasions, but it didn't offer anything else Well, in addition, the district judge took note of the fact that he was living off of the proceeds from drug sales, which makes it reasonable to infer that these four are not the only ones. Sure. Well, she didn't make a determination about what the amount was that he was living off of. He did have an injury settlement, and he was working, so he had other sources of income. The amount that was found there, Judge, was $2,850. That would be suggestive of rather small-time drug dealing, and that's only if you can even consider that all that $2,850 was drug proceeds, but he had other sources of income, which were lawful. So I don't think the district court could reasonably speculate or reach a conclusion that would show, again, that this was something that takes this out of a primary use for lawful purpose and shows instead primary use that would support the drug premises enhancement. The sentence that he got, the 55-month sentence, is right in the middle of the adjusted range without this enhancement, right? Right. So the range would be lower, and he'd do less time if he doesn't get the enhancement, which is a significant thing. Well, there's another way to interpret what the judge did, which is even with the error he got a below-guideline sentence, it falls smack in the middle of the adjusted range without the enhancement, so no harm, no foul. Should she have said that, we'd have a harmlessness issue, but that wasn't what was said. So it's a thing to speculate about, but it isn't something that can be demonstrated from the sentencing transcript. So I think that my client is entitled to relief if the enhancement doesn't apply, his range would be lower. I don't think the government met its burden. I don't think the district court engaged in the necessary analysis. What was the amount he flushed down the toilet? I don't recall there being an amount flushed down the toilet, but your command of the facts might be better than mine on that, Judge. They recovered additional drugs, that's for sure, but the amounts they covered, I think, for the heroin and the methamphetamine, one was 49 grams and the other was 30-some grams. Again, it's not a lot of drugs. I'll reserve the balance of my time. Thank you. Okay, thank you very much, Mr. Hillers. Mr. Bedroy? Good morning again. So Mr. Bedroy, has the Justice Department run out of serious crimes? This is trivial. Why does the federal government get involved in a little petty drug selling of this sort? Don't you have state authorities who deal with this? It's one of those questions, Your Honor, that I'm actually the perfect person to answer for once. Why not? You're the U.S. Attorney. I prosecuted Paul Winfield in 2001. He was the head of a gang of about 17 P-stones who'd come up from Chicago, ran a big crack cocaine. We did a wiretap and we took down all these people. He got a 17-year sentence, which was reduced ultimately with the crack, you know, a little bit here and there. He gets out of prison. So why is Paul Winfield our case, is your question? He's our case because when we have guys come out whom we've done before, and as I said at sentencing or said at trial. But apparently he didn't like his 17-year sentence, so now he's just a little petty drug dealer, right? He's a nobody. I think the lesson he took, and it seems, is he wasn't going to deal crack anymore. He was going to deal heroin and meth. But we were going to do a revocation, which we did, and just as a matter of fact. And I don't understand why this isn't something for the state authorities because it's so petty. It's so nothing. I guess, Your Honor, with all due respect, I don't see it that way when he is essentially our defendant. We put him in federal prison. He came out. We do all these guys. When they do it again, we do them. You keep your own repeaters. We do our own repeaters. You do your own. I missed the word. We do our own repeaters. Repeaters. But he's not repeating, right? He's not repeating his crack and so on. He's down to his little apartment and selling some small quantities of heroin and meth, which is not such a big deal right now. How long is the sentence? 17 years? He did 17, and then that was reduced with the various crack adjustments to the guidelines. Was he under supervised release? Yes, Your Honor. He was under supervision, and he got a 27-month sentence on the revocation, and Judge Crabb ran the two of them concurrently. So this is concurrent with one that's already been imposed? At the same time. Basically, the revocation and the prosecution were done at the same time. Does it make any difference what we do then? Well, it always makes a difference what you do. I certainly want to say that. Well, if he's already done a revocation, he's doing the same. Was that just the 27 months? That's 27 months. So if this case were to come back and the two points were to be taken away and Judge Crabb were to give him less than 55, he would do less than 55. I do think, and it's really a follow-up, I think, to your question, Judge Posner, and it's really the briefs go back and forth on this, the guidelines simply don't say that the premises enhancement only applies to the multi-kilo dealer or the person storing kilos. But we're accustomed to stash houses. Right. And that's a big deal. They're dangerous, they're armed, and of course the authorities love to encourage the suckers, say, very dangerous, you're going to hold up a stash house. You've got to be heavily armed. Then they all get arrested and prosecuted. So that I understand. I understand the stash houses, but this seems like such a pathetic shadow of a stash house. And I must admit, I see it not as a stash house. I mean, we've done stash house cases as well. But I thought the enhancement was intended for stash houses. Well, I guess I would disagree, Your Honor. It doesn't say that. It says if you use it to distribute, and distribution can also be storage for distribution. And basically we've also done, which is why he was charged with using a place for distributing controlled substances, the 856 charge that was dismissed with the plea agreement. I think we see a fair number of cases where somebody sets up a place. Tell me again what the enhancement months is. What happened is he had a base of 24, added two for using the premises. Ultimately, he ended up after the three levels for acceptance at 70 to 87 months. There was a one-level reduction because he'd given us some information, another case, so he got a little 5K. He ended up at 63 to 78, and from that Judge Crabb decided a 55-month sentence under 3553 was appropriate. Now, if you took away the two levels, you wouldn't start at 70 to 87. You might start more in the 60s. You might even start at 63 to 78, a little higher than that. You would start somewhere in the mids, around 70 to thereabouts. So it's probably... 51 to 63. There we go. That was going to be the next thing I said. 51 to 63 is where he might end up. So the judge would be in a position... You gave him the same sentence. ...to do it. Now, Mr. Hill is exactly correct. She didn't say that, and I'm not making that argument, but that is certainly what she could do. So I would just make two brief, quick comments on the facts, because I, as much as anything, I find it interesting. Mr. Hillis makes the argument correctly that he lived there for a year, and it looks like he only sold four times in this year. I actually think the correct way to look at this is in the two-and-a-half months that we were involved in buying from him, he sold four times to us, and Judge Crabb implied, or excuse me, inferred, that that meant we weren't the only customer, and that there were other amounts there. There was always... We saw a total of about another seven ounces, I think, of heroin, a couple ounces of methamphetamine. Does he have any lawful employment? He had not had any lawful employment for the six months leading up to his arrest. Before that, he did have some, but he told the police, and he told, it was in the PSR, that by this time it was basically only drug dealing. And in terms of that extra weight, the weight that was always seen, the PSR comment that Mr. Hillis refers to is correct, but what they were getting at is we didn't add any of that into his relevant conduct. We don't know if it was the same two ounces a month later that he had, and so it seems unlikely. But their point was we didn't have any test of it, we didn't know if it was just sitting there. You weren't going to keep adding up the same drugs. He was also not selling... He was selling something he really wasn't selling. That is, he was selling something that was supposed to have ecstasy and it didn't have ecstasy. Yeah, when we started out thinking this was MDMA, it was ecstasy, I must admit when it turned out to be methamphetamine, that used to be more of a problem in rural Wisconsin rather than in southern Wisconsin. So the long and the short of it is I think, with all due respect, that even the guideline can apply even to a relatively small dealer who has chosen not to sell in the Walmart parking lot or the street corners or in his car like they normally do. He's setting up shop at home, storing the stuff there, and then however it sorted itself out for sentencing, it still started with a higher guideline. So I appreciate your time. Thank you. Okay, thank you, Mr. Verdreux. Mr. Hillis? Respectfully, if we're to follow the government's logic, then any time there are drugs that are kept at a premises, it's a basis for a premises enhancement. So that can't be dispositive. We have to look at the other factors. The quantity is an important factor. It doesn't have to be kilos, but it shouldn't be this small. If he had sold this stuff on a street corner rather than at home, would that have affected his sentence? Yes. Is it considered worse to sell it from inside a building? Yes, apparently it is. If it's a basis for Congress to enact a separate law, 18 U.S.C. Section 856, premises. They don't convict him of that because they know, of course, they're going to bump him up with the two-level enhancement, so it all comes out in the wash. So, yes, apparently they think if you do something in the privacy of your own home, it's more pernicious than if you do it out under the public street lamps. We really don't know how much drugs he had there because he flushed some down the toilet, right? If you can't prove it, you shouldn't speculate about it. Well, he said he did. We didn't say how much, but he said he flushed it. Well, I guess that might mean that he is not dumb as a post, but shouldn't be penalized for this. I have nothing further to say. Okay, thank you very much, Mr. Ellis and Mr. Petroi. Thank you.